**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **BESSIE P. SMITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION 05-0519-WS-M** |
| | ) | |
| **HOUSING AUTHORITY OF THE** | ) | |
| **CITY OF PRICHARD,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

**ORDER**

This matter is before the Court on defendants' Motion for Summary Judgment (doc. 29). The Motion has been briefed and is ripe for disposition at this time.[1]

**I.    Background.**

  *A.    Facts.*[2]

This action arises from plaintiff Bessie Smith's employment with defendant Housing Authority of the City of Prichard (the "Housing Authority") and, more specifically, the termination of such employment in July 2004.

Smith's employment history with the Housing Authority dates back to 1989, subject to a couple of breaks in service that are not material to these proceedings.  (Smith Dep., at 56-62.)  In 1999, Smith applied for and received the position of Section 8 Program Manager at the Housing Authority, a job she held until her discharge five years later.  (*Id.* at 62.)  In this capacity, Smith bore responsibility for operating and overseeing the Housing Authority's Section 8 program,

---

[1]    Under the E-Government Act of 2002, this is a written opinion and therefore is available electronically.  However, it has been entered only to decide the motion or matter addressed herein and is not intended for official publication or to serve as precedent.

[2]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party.  *See Lofton v. Secretary of Dept. of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004); *Johnson v. Governor of State of Fla.*, 405 F.3d 1214, 1217 (11th Cir. 2005).  Thus, plaintiff's evidence is taken as true and all justifiable inferences are drawn in her favor.

including running the day-to-day aspects of that program.  (*Id.* at 75-76.)[3]  As part of her duties, Smith was responsible for ensuring that the Housing Authority's Section 8 staff did a good job. (*Id.* at 104-05.)  Throughout her employment as Section 8 Program Manager, Smith never had a written contract of employment with the Housing Authority.  (*Id.* at 78.)[4]

Some time after Smith became Section 8 Program Manager, the Housing Authority provided her with a copy of its new employee handbook, which contains the Personnel Policy of the Housing Authority.  (*Id.* at 80.)  Upon receiving that handbook, Smith read and generally became familiar with it.  (*Id.* at 82.)  The very first section of the handbook explained that its purpose was "to establish normal procedures which will serve as a guide to administrative action concerning the various personnel activities of the authority."  (Plaintiff's Exh. 1, at 1.) According to Section 4.1.1 of the handbook, "[a]ll employees shall be 'at-will' employees except those hired and covered by a written employment contract."  (*Id.* at 18.)  Moreover, the portion of the handbook addressing discipline and termination was prefaced by a statement in Section 17.1 that "[t]his section on employee disciplinary procedures and termination is for guidance to supervisory personnel only.  It is not a contract between the Authority and its employees.  This section merely describes for supervisory personnel the Authority's general philosophy in grievance procedures and termination decisions."  (*Id.* at 37.)

On July 22, 2004, the Housing Authority's Executive Director, defendant Charles Pharr,

---

[3]     According to the U.S. Department of Housing and Urban Development ("HUD"), Section 8 "is the federal government's major program for assisting very low-income families, the elderly and the disabled to afford decent, safe, and sanitary housing in the private market." (Housing Choice Vouchers Fact Sheet, www.hud.gov.)  Local public housing agencies receive federal funds from HUD to administer a voucher system, under which the public housing authority provides a voucher to eligible families for use towards any housing owned by a private landlord who agrees to accept such vouchers.  *See Knapp v. Smiljanic*, 847 F. Supp. 1428, 1431 (W.D. Wis. 1994) (explaining Section 8 program).

[4]     Indeed, Smith testified that the only time she ever had a written employment contract during her association with the Housing Authority was in the 1989-1993 time frame, when Smith entered into temporary contracts with the Housing Authority to work on the Summer Lunch Program.  (*Id.* at 56-57, 78.)  Plaintiff does not suggest that her contractual relationship with the Housing Authority during the late 1980s and early 1990s in any way contributed to or created a written contract of employment pertaining to Smith's work as Section 8 Program Manager from 1999 through 2004.

met with Smith and gave her a termination letter, which he described as being from the Housing Authority's Board of Commissioners (the "Board"), all five members of which plaintiff has named as defendants in this action. (Smith Dep., at 93.) That letter, which was signed by Pharr, provided that Smith's employment was being terminated, effective immediately, "as a result of action of the Board of Commissioners because of insubordination or uncooperative attitude tending to lower discipline, or morale." (Plaintiff's Exh. 2.) Pharr's letter went on to recite specific provisions of the Housing Authority's Personnel Policy (as embodied in the handbook) that Smith had violated. (*Id.*)[5] The letter also notified Smith that she was entitled to a hearing before the Executive Director upon request and that she was also entitled to waive that hearing and proceed directly to a hearing before the Board upon timely written notice. (*Id.*) In this respect, the July 22 letter closely tracks the procedures outlined in Section 17.4 of the Personnel Policy. Upon giving the letter to Smith, Pharr asked her if there was anything she needed or anything she wanted to say. (Smith Dep., at 94, 109.) Smith requested no additional information or clarification at that time. (*Id.* at 109.)

The record reflects that Smith, by and through counsel, timely requested a hearing before Executive Director Pharr. (Smith Dep., at 110.) That hearing was conducted on October 6, 2004, at which time plaintiff's counsel questioned Pharr regarding the specifics of each ground for termination articulated in the July 22 letter. (Plaintiff's Exh. 13, at 3-4.) In each instance, Pharr responded that the Board had made the termination decision and referred plaintiff's counsel to the July 22 letter. (*Id.*) Smith herself offered no testimony or evidence of any kind. (Smith Dep., at 114.) On October 8, 2004, Pharr notified Smith in writing of his determination that he lacked the authority to reverse the Board's decision to terminate her employment. (*Id.* at 118; Plaintiff's Exh. 5.) The October 8 letter explained that Smith had the right to appeal Pharr's determination to the Board via timely written request, and described the appeal procedures in a

---

[5]     In particular, Pharr's letter charged Smith with violating § 17.3.1(1) (insubordination or uncooperative attitude, tending to lower discipline and morale), § 17.3.1(2) (failure to work at an acceptable level of competence as determined by Supervisor or Executive Director), and § 17.3.1(15) (discourteous treatment of the public, residents or other employees). (Plaintiff's Exh. 2.) The letter did not provide specific examples of these categories of misconduct or poor performance that Smith had been found to exhibit.

manner that again closely followed Section 17.4 of the Personnel Policy.  (*Id.*)  Smith timely appealed to the Board.  (Smith Dep., at 118.)  The Board convened a hearing to hear plaintiff's appeal on December 6, 2004.  (Defendants' Exh. 6.)  During that hearing, the Board's attorney presented evidence supporting the termination decision, and plaintiff and her attorney were given the opportunity to question the Board's witnesses, inspect the Board's evidence, and make statements and present evidence.  (*Id.*; Smith Dep., at 120.)  Plaintiff's counsel balked during the hearing that this was the first time Smith had heard the specific accusations against her, which related primarily to a contention that plaintiff had wrongfully issued a Section 8 housing voucher to an applicant named Jacqueline Haston out-of-turn, effectively leapfrogging Haston's application ahead of numerous others and falsifying records to effectuate same.  (Plaintiff's Exh. 6, at 51.)[6]  At a meeting on December 8, 2004, the Board voted to uphold Smith's termination, with full pay through that date.  (Defendants' Exh. 7.)[7]

> **B.    Relevant Procedural History.**
>
> > *1.    The Complaint and Removal.*

On or about July 22, 2005, Smith filed a Complaint in the Circuit Court of Mobile County, Alabama, naming as defendants the Housing Authority; all five Board members, both individually and in their official capacities, including Darren L. Flott, John Langham, Jr., Minnie Levingston, Rochelle D. Rankins, and Michael A. Howard; and Pharr, individually and as Executive Director of the Housing Authority.  The Complaint identified causes of action for breach of employment contract (Count I), violation of due process rights (Count II), and conspiracy to interfere with an employment contract (Count III).  With respect to Count I, plaintiff alleged that the Personnel Policy constituted a contract of employment, which defendants had breached by failing to notify her of the specific reasons for her termination until

---

[6]    Plaintiff maintains that this notification of the specific reasons underlying her termination contravenes the Personnel Policy, which provides in pertinent part that the Executive Director "may dismiss a regular employee provided that the person to be discharged **has been first presented with the reasons for such discharge, specifically stated** and given the opportunity to respond."  (Plaintiff's Exh. 2, § 17.4 (emphasis added).)

[7]    Of the five commissioners, none voted against that decision and only one (defendant John Langham, Jr.) abstained.  (Defendants' Exh. 7.)

the Board hearing (which she claims effectively stripped her of her right to appeal to the Board), and by conducting an Executive Director hearing at which Pharr professed ignorance of the specific reasons underlying her dismissal. (Complaint, ¶¶ 14-15.) As for Count III, the Complaint alleged that "Defendants conspired and confederated in order to interfere with the employment contract of Bessie Smith" because defendants wished "to remove Plaintiff from her position in order to place a person of their own choosing in the position held by Plaintiff." (*Id.*, ¶¶ 23-24.) Defendants removed this action to federal court on September 9, 2005, pursuant to 28 U.S.C. §§ 1331 and 1441(a). (*See* doc. 1.) Subject matter jurisdiction was predicated on the existence of a federal question, inasmuch as Count II alleged a violation of plaintiff's due process rights under the United States Constitution, such that it was effectively a claim under 42 U.S.C. § 1983.

2.      <em>The Abandonment of Count II.</em>

During the course of summary judgment briefing, plaintiff has abandoned one of her causes of action, and has morphed another into a different claim altogether. In particular, Smith informed both defendants and this Court that she "is no longer pursuing the Due Process count" found at Count II. (Defendants' Sur-Reply (doc. 34), at Exh. 11.)[8] Plaintiff having expressly abandoned this cause of action, the Court finds that defendants' Motion for Summary Judgment is due to be, and the same hereby is, **granted** as to Count II, and that cause of action is **dismissed with prejudice**.

The dismissal of Count II creates an interesting jurisdictional wrinkle, inasmuch as it was the only federal cause of action asserted. All remaining claims are exclusively state-law claims as to which original federal jurisdiction is lacking, and there is no diversity of citizenship.[9] The

---

[8]      This statement, set forth in an e-mail from plaintiff's counsel to defendants' counsel late in the summary judgment briefing process, was reinforced by plaintiff's representation in a subsequent filing that "[t]he Plaintiff has abandoned her claim of violation of her federal due process rights." (Plaintiff's Additional Response (doc. 38), at 2.)

[9]      The parties have not identified this jurisdictional issue. Nonetheless, because of its limited jurisdiction, this Court bears an affirmative duty to inquire *sua sponte* whenever it appears that subject matter jurisdiction may be lacking. *See Fitzgerald v. Seaboard System R.R., Inc.*, 760 F.2d 1249, 1251 (11th Cir. 1985) ("A federal court not only has the power but also the obligation at any time to inquire into jurisdiction whenever the possibility that jurisdiction does

-5-

only jurisdictional basis for Counts I and III is supplemental jurisdiction, pursuant to 28 U.S.C. §

1367(a).  By statute, a district court may decline to exercise supplemental jurisdiction if it "has

dismissed all claims over which it has original jurisdiction."  § 1367(c)(3).  In that scenario, the

decision of whether to exercise supplemental jurisdiction over the state-law claims rests in the

Court's discretion.  *See generally Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1185 (11th Cir.

2003) (in exercising § 1367(c) discretion, court should consider principles of economy,

convenience, fairness, and comity); *Palmer v. Hospital Authority of Randolph County*, 22 F.3d

1559, 1569 (11th Cir. 1994) (similar).  After careful consideration of the *Shotz* factors, the

undersigned is of the opinion that the continued exercise of § 1367 jurisdiction over Counts I and

III is appropriate under the specific circumstances of this case, notwithstanding plaintiff's

abandonment of her federal cause of action, because (a) these state-law issues have been

extensively litigated and briefed in this forum, (b) the questions of Alabama law implicated by

Counts I and III are straightforward, black-letter and well-settled, (c) the parties would incur

needless expense and delay in litigating this matter if Counts I and III were remanded to state

court, and (d) the state court would be placed in the awkward position of being thrust at a

dispositive juncture into a matter as to which it has had no involvement for nearly 18 months.[10]

On that basis, the Court will exercise supplemental jurisdiction over Counts I and III,

notwithstanding the pre-trial dismissal of the lone federal claim in this non-diversity action.

     *3.       The Metamorphosis of Count III.*

     Contemporaneously with abandoning her due process cause of action, Smith announced

---

not exist arises."); *Smith v. GTE Corp.*, 236 F.3d 1292, 1299 (11th Cir. 2001) ("[B]ecause a
federal court is powerless to act beyond its statutory grant of subject matter jurisdiction, a court
must zealously insure that jurisdiction exists over a case, and should itself raise the question of
subject matter jurisdiction at any point in the litigation where a doubt about jurisdiction arises.").

     [10]     *See Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 746 (11th Cir. 2006)
(explaining that policy of supplemental jurisdiction "is to support the conservation of judicial
energy and avoid multiplicity in litigation," and it is appropriate to exercise jurisdiction where
substantial judicial resources have already been committed, such that sending case to another
court will cause substantial duplication of effort); *Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th
Cir. 2004) (although district court may decline supplemental jurisdiction under § 1367(c)(3) after
dismissing all federal claims, "the court may continue to exercise supplemental jurisdiction even
after the federal claims are dismissed").

that she "is no longer pursing the conspiracy part of the Intentional interference count. The only Intentional interference is against Flott." (Defendants' Sur-Reply (doc. 34), at Exh. 11.)[11]  As pleaded in the Complaint, Count III is framed as a cause of action against all defendants for conspiracy to interfere with an employment contract. Plaintiff never filed a motion seeking to amend her Complaint to refashion this conspiracy cause of action as a claim for intentional interference with contract against defendant Flott. In lieu of filing a motion to amend pursuant to Rule 15(a), Smith has relied on summary judgment briefs and correspondence with opposing counsel to recast Count III in this manner.

Notwithstanding the liberal pleading standard for civil complaints under Rule 8(a)(2), Fed.R.Civ.P., a brief opposing summary judgment is not a proper mechanism for amending a complaint.[12]  That said, the law is clear that "issues not raised in the pleadings may be treated as if they were properly raised when they are tried by express or implied consent of the parties." *Steger v. General Elec. Co.*, 318 F.3d 1066, 1077 (11th Cir. 2003); *see also Price v. M&H Valve Co.*, 2006 WL 897231, *11 n.7 (11th Cir. Apr. 7, 2006) (dismissing claim raised by plaintiff for first time in summary judgment opposition brief, but only because defendant objected on that basis). Far from objecting to this *de facto* amendment of the Complaint, defendants embraced it, acknowledging in their reply brief that an intentional interference with contract claim has been joined in this action. (Defendants' Reply (doc. 34), at 6-11.) Defendants' acquiescence that there is a live claim in this case for intentional interference with contract (as opposed to conspiracy to intentionally interfere with contract) constitutes implied consent to trying Count III in this modified manner; therefore, the *Gilmour/Hurlbert* line of authority is inapplicable, and

---

[11]     Again, this statement was echoed in plaintiff's assertion to this Court that "her only claims are for breach of contract and intentional interference with a contract. The only matter involving individual liability is the intentional interference with a contract claim asserted against Darren Flott." (Plaintiff's Additional Response (doc. 38), at 2.)

[12]     *See Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment."); *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006) (having proceeded through discovery without seeking to amend complaint to reflect new theory of cause of action, plaintiff "was not entitled to raise it in the midst of summary judgment").

the Court will consider plaintiff's intentional interference with contract cause of action, notwithstanding her failure to plead it as a separate cause of action in the Complaint or any amendments thereto.

## II.   Summary Judgment Standard.

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied its responsibility, the burden shifts to the nonmovant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## III.   Analysis.

### A.   Breach of Contract Claim (Count I).

The gravamen of Count I of the Complaint is that the Housing Authority breached an employment contract with Smith by failing to abide by certain termination procedures outlined in the Personnel Policy set forth in the Housing Authority's handbook.  Defendants maintain that they are entitled to judgment as a matter of law on Count I because Smith did not have a contract of employment, but was instead an at-will employee.

"[T]he rule is well settled in Alabama that an employee contract at will may be terminated by either party with or without cause or justification."  *Hoffman-La Roche, Inc. v. Campbell*, 512 So.2d 725, 728 (Ala. 1987); *see also Ex parte Amoco Fabrics and Fiber Co.*, 729

-8-

So.2d 336, 339 (Ala. 1998) ("The bedrock principle of Alabama employment law is that, in the absence of a contract providing otherwise, employment in this state is at-will.").  Alabama courts impose a "heavy burden" on employees to prove that a challenged employment relationship is other than "at will."  *Bain v. Gartrell*, 666 So.2d 523, 524 (Ala.Civ.App. 1995).

Notwithstanding the foregoing, Alabama law provides that policies set forth in an employee manual issued to an employee can become a binding promise if the employee accepts it by continuing to work when she is not required to do so.  *Hoffman-La Roche*, 512 So.2d at 733; *see also Harper v. Winston County*, 892 So.2d 346, 351 (Ala. 2004) ("an employee handbook can represent a binding contract obligating an employer to satisfy certain conditions precedent to dismissing an employee"); *Ex parte Graham*, 702 So.2d 1215, 1218 (Ala. 1997) (recognizing that at-will relationship can be modified by handbook provisions in which employer promises not to discharge employee except by specified procedures).  In order for a handbook to be contractually binding on an employer, "the language used in the handbook must be specific enough to constitute an actual offer rather than a mere general statement of policy. ... [I]f the employer does not wish the policies contained in an employee handbook to be construed as an offer for a unilateral contract, he is free to so state in the handbook."  *Hoffman-La Roche*, 512 So.2d at 734.  Clearly, then, a handbook can constitute an offer to create a binding unilateral contract provided that (1) the handbook language is sufficiently specific to constitute an offer; (2) the offer is communicated to the employee by issuance of the handbook; and (3) the employee accepts the offer by voluntarily retaining employment after becoming aware of the offer.  *Id.* at 735.  Whether a handbook satisfies the *Hoffman-La Roche* test is a question of law to be decided by the court.  *See Campisi v. Scoles Cadillac, Inc.*, 611 So.2d 296, 298 (Ala. 1992).

Alabama courts applying *Hoffman-La Roche* have routinely found that an employee handbook does not constitute a binding contract where it contains an appropriate disclaimer by the employer.  In *Harper*, for instance, the handbook included statements that the document and the working rules and conditions set forth therein were merely "a guide."  The *Harper* court found that "[t]his language is sufficient to negate the inference that the handbook constituted an offer ... to create a binding employment contract."  892 So.2d at 351; *see also Dykes v. Lane Trucking, Inc.*, 652 So.2d 248, 249-50 (Ala. 1994) (holding that plaintiff was at-will employee

where handbook specified at-will relationship and stated that policies were not intended to create contract); *Campisi*, 611 So.2d at 299-300 (handbook is not offer or promise where its language constitutes general guidelines for discharge and termination but does not contractually limit manner and procedure by which employer may discharge employee); *Abney v. Baptist Medical Centers*, 597 So.2d 682, 683 (Ala. 1992) (holding, as a matter of law, that no contract is created when employee handbook contained a statement disclaiming an employment contract and restating that employment was "at will"); *Clark v. America's First Credit Union*, 585 So.2d 1367, 1370 (Ala. 1991) (employer exercised its privilege not to have manual considered as unilateral contract by including statement that manual is not a binding contract).

Under any reasonable application of the *Hoffman-La Roche* test, the Housing Authority's handbook does not constitute an offer to create a binding unilateral contract.  The Housing Authority exercised the privilege created by *Hoffman-La Roche* to state clearly in its handbook that it did not wish for the policies set forth therein to be construed as an offer for a contract. Indeed, the handbook included specific disclaimers that the Personnel Policy was merely "a guide to administrative action," that all Housing Authority employees without written contracts would be deemed at-will, that the section on discipline and termination "is for guidance only" and "is not a contract between the Authority and its employees," and that the handbook policy statements merely summarize the Housing Authority's "general philosophy" on termination procedures.  (Plaintiff's Exh. 1, at §§ 1.1, 4.1.1, and 17.1.)  As with the handbooks at issue in *Winston*, *Abney*, *Dykes* and the like, the Housing Authority's handbook disclaimers are sufficiently clear as a matter of law to preclude construction of that handbook as an offer of a unilateral contract.

In opposing defendants' summary judgment motion as to Count I, plaintiff quarrels with none of these principles.  She does not contend that the handbook lacks an effective disclaimer apprising her that the Personnel Policy is not to be construed as an offer for a contract.  Instead, Smith argues that the doctrine of equitable estoppel precludes the Housing Authority from arguing that the handbook is not contractually binding.  As the Court understands it, plaintiff's position is that because defendants adhered to the letter of the Personnel Policy as to certain aspects of Smith's termination process, they were obligated to hew to that Personnel Policy in all

other respects.[13]  Plaintiff succinctly frames her argument as follows: "Because the PHA pretended to follow the Personnel Policy Manual concerning discipline, Bessie Smith believed that they would follow the Policy.  She relied upon that, hired and paid an attorney to represent her at the various hearings, and did not seek other employment during that time.  PHA is estopped from denying that the Personnel Policy Manual was part of the employment agreement it had with Bessie Smith."  (Plaintiff's Brief (doc. 31), at 13-14.)[14]

Under Alabama law, "[t]he purpose of the doctrine of equitable estoppel is to promote equity and justice in an individual case by preventing a party from asserting rights under a general rule of law when his own conduct renders the assertion of such rights contrary to equity and good conscience."  *Robinson v. Boohaker, Schillaci & Co., P.C.*, 767 So.2d 1092, 1094 (Ala. 2000) (citation omitted); *see also Fountain Bldg. & Supply Co. v. Washington*, 602 So.2d 362, 365 (Ala. 1992) (generally, there is no estoppel unless, without it, the actions of the party being estopped will result in a wrong).  Indeed, equitable estoppel applies only where "(1) the actor with knowledge must communicate misleadingly; (2) the other must rely on the misleading communication; and (3) the other must be harmed materially if the actor acts inconsistently with his earlier conduct."  *Smith v. State Farm Mut. Auto. Ins. Co.*, --- So.2d ----, 2006 WL 2037166, *7 (Ala. July 21, 2006).  Plaintiff has offered no evidence to satisfy any of these elements.  She

---

[13]    Smith's position is that the Housing Authority did not act in conformity with the Personnel Policy when it discharged her without first presenting her with the reasons for such discharge, specifically stated, and giving her an opportunity to respond.  According to plaintiff, she was never told the specific reasons for her dismissal until her appeal hearing before the Board in December 2004, which is later than the Personnel Policy requires.  Thus, plaintiff's view is that (a) defendants are equitably estopped from arguing that the handbook was not an offer of a unilateral contract, and (b) defendants breached the terms of that handbook by denying her certain procedural rights antecedent to her dismissal.

[14]    These assertions are unaccompanied by any citations to the record, and lack support therein.  Of course, mere unsupported representations of counsel do not constitute evidence that may be considered on summary judgment. *See, e.g., Nieves v. University of Puerto Rico*, 7 F.3d 270, 276 (1st Cir. 1993) ("Factual assertions by counsel in motion papers, memoranda, briefs, or other such 'self-serving' documents, are generally insufficient to establish the existence of a genuine issue of material fact at summary judgment."); *Bowden ex rel. Bowden v. Wal-Mart Stores, Inc.*, 124 F. Supp.2d 1228, 1236 (M.D. Ala. 2000) ("opinions, allegations, and conclusory statements of counsel do not substitute for evidence").

points to no record evidence that the Housing Authority made misleading communications that her termination would be governed solely and exclusively by the Personnel Policy as a matter of contractual obligation.[15]  She offers no evidence of reliance; indeed, plaintiff's four-page affidavit is devoid of any suggestion that she relied on any representations the Housing Authority might have made that it was contractually bound to apply the Personnel Policy to her discharge proceedings.[16]  Finally, Smith has utterly failed to provide any evidence of <u>detrimental</u> reliance. How would she be wronged if the Housing Authority were allowed to "back out" of any representations that the Personnel Policy would apply?  What would she have done differently had she known throughout her termination process that the Personnel Policy procedures would not be applied strictly to her case?  Plaintiff offers no evidence or argument that might answer these critical questions.

Simply put, on this record, the interests of equity and justice would in no way be compromised by allowing the Housing Authority to argue that there was no employment contract obligating it to abide by the Personnel Policy in processing Smith's discharge.  The Alabama doctrine of equitable estoppel has no application here, and cannot save Count I from the ravages

---

[15]     At most, Smith observes that the notice of termination dated July 22, 2004 and the notice of Executive Director decision dated October 8, 2004 track the procedures and requirements of the Personnel Policy.  That is markedly dissimilar from an affirmative representation that the Housing Authority was contractually bound to adhere to the Personnel Policy in all aspects of Smith's termination procedures.

[16]     Any such reliance would have been unreasonable under the circumstances of this case.  As mentioned *supra*, § 17.4 of the Personnel Policy provided that an employee may be discharged "provided that the person to be discharged has been first presented with the reasons for such discharge, specifically stated and given the opportunity to respond." (Plaintiff's Exh. 1, at 40.)  If, as plaintiff insists, that procedure was not followed here, she must have known that to be true by no later than July 22, 2004, when she received her termination letter and the discharge process began.  Stated differently, the Housing Authority's noncompliance with that threshold requirement of the Personnel Policy at the outset of her termination process placed her on notice that the Housing Authority did not intend to adhere strictly to the Personnel Policy in processing her termination.  In light of that fact, any reliance Smith might have made on subsequent representations to the contrary would have been unreasonable.

-12-

of Rule 56.[17]  There being no contract of employment, the Housing Authority was not contractually obligated to apply any particular procedures in carrying out Smith's dismissal. Count I is due to be dismissed.

### B. Tortious Interference Claim (Count III).

Plaintiff's sole remaining cause of action is Count III, which has been recast as a claim against defendant Darren Flott, a member of the Board, for tortious interference with contractual relations.  Defendants raise several bases for dismissing Count III; however, the Court's analysis begins and ends with the legal prerequisite that the defendant must be a third party with respect to the interfered-with contract.

---

[17]     Even if Smith could somehow show that the baseline elements for equitable estoppel are satisfied in this case, this basis for affixing liability would nonetheless fall short for three additional reasons.  First, under Alabama law, equitable estoppel "cannot be utilized to create primary contractual liability where none would otherwise exist. ... If there was no contract out of which a cause of action could arise, one may not by the theory of waiver or estoppel be prevented from so pleading."  *Bates v. Jim Walter Resources, Inc.*, 418 So.2d 903, 905 (Ala. 1982); *see also Merchants Nat. Bank of Mobile v. Steiner*, 404 So.2d 14, 19 (Ala. 1981) (opining that plaintiff cannot use estoppel as an affirmative device to create a contract where none otherwise exists).  Here, there was no contract of employment between Smith and the Housing Authority out of which a cause of action might arise, so it would be improper for Smith to rely on the theory of estoppel to bar defendants from pleading that no contract exists.  Second, as defendants correctly point out, plaintiff failed to plead estoppel at any time before her opposition brief on summary judgment.  Alabama law generally requires that estoppel be specially pleaded, and that the pleadings allege specific facts upon which the estoppel is predicated.  *See Kimbrell v. City of Bessemer*, 380 So.2d 838, 839 (Ala. 1980); *Nelson Realty Co. v. Darling Shop of Birmingham, Inc.*, 101 So.2d 78, 83 (Ala. 1957).  Plaintiff having failed to plead estoppel specially, and defendants having objected to her attempt to inject this issue for the first time on summary judgment, estoppel is not properly joined in this litigation.  Third, in order for this equitable doctrine to apply, "[t]he party asserting equitable estoppel must be free from fault." *Robinson*, 767 So.2d at 1094.  Smith is not free from fault.  There is no evidence that she ever engaged in a meaningful effort to ask defendants whether the Housing Authority was obliged to follow the Personnel Policy in her case, or that she followed up with defendants to learn the specifics of the charges against her in advance of the Board hearing.  At most, the record shows that she made perfunctory requests at the October 2004 hearing and in a July 2004 letter to learn the specifics of the charges against her, without following up or inquiring as to whether the Personnel Policy was binding here.  To the extent that any miscommunication or information deficiency existed, Smith shared responsibility for that condition because of her own unfounded assumptions and lack of diligence.  Plaintiff therefore cannot invoke the doctrine of equitable estoppel in her favor.

Alabama law is clear that "it is essential to a claim of tortious interference with contractual relations that the plaintiff establish that the defendant is a 'third party,' i.e., a 'stranger' to the contract with which the defendant allegedly interfered." *Tom's Foods, Inc. v. Carn*, 896 So.2d 443, 454 (Ala. 2004) (citing *Parsons v. Aaron*, 849 So.2d 932, 946-47 (Ala. 2002)); *see also McFarlin v. Conseco Services, LLC*, 381 F.3d 1251, 1261 (11th Cir. 2004) (recognizing that defendant's status as a non-party to the relationship is an element of tortious interference claim under Alabama law). The reason for this boundary on the tort is that a party to a contract cannot, in law or logic, be deemed to be interfering with that contract. *See Tom's Foods*, 896 So.2d at 454 (citations omitted). Thus, Alabama courts require a plaintiff asserting a tortious interference claim to prove that "the defendant is a 'third party' or a 'stranger' to the contract or business relationship with which the defendant allegedly interfered." *Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So.2d 1143, 1154 (Ala. 2003).

Where a plaintiff attempts to bring a tortious interference claim against a manager or officer of his employer, the Alabama Supreme Court has opined that "[a] corporate officer or employee ... may individually commit the tort of intentional interference with business or contractual relations to which the corporation or employer is a party." *Pegram v. Hebding*, 667 So.2d 696, 701 (Ala. 1995). However, *Pegram* also states that, in order to conform with the "third party" element, such an action can be maintained only if the officer or employee being sued "was acting outside the scope of employment and with actual malice at the time of the interference." *Id.*; *see also Hickman v. Winston County Hosp. Bd.*, 508 So.2d 237, 239 (Ala. 1987) (similar); *Morrow v. Auburn University at Montgomery*, 973 F. Supp. 1392, 1409 (M.D. Ala. 1997) (similar); *Pouncy v. Vulcan Materials Co.*, 920 F. Supp. 1566, 1585 (N.D. Ala. 1996) (finding that an agent of a party to the contract, if acting within the scope of authority, cannot be liable for tortious interference with that contract).

Review of the summary judgment record reveals that plaintiff has not made a sufficient showing to raise a genuine issue of material fact as to the "scope of authority" requirement.[18] In

---

[18]     As a threshold matter, defendants challenge whether the *Pegram* line of authority can even be applied to Flott, who was a member of the Housing Authority's Board of Commissioners and not an "officer" or "employee" of the Housing Authority. There is no reason to think, however, that Alabama courts would treat a Board member any differently than

that regard, plaintiff fails to articulate any basis under which a reasonable factfinder could conclude that Flott acted outside the scope of his authority in moving, advocating and voting for Smith's dismissal as Section 8 Program Manager.  To the contrary, the record shows that Flott undertook these activities at Board meetings, in his capacity as Board member, and upon consultation and discussion with other Board members.  In particular, meeting minutes reflect that at a Board meeting on July 21, 2004, Flott moved that Smith be terminated and identified specific grounds for same.  (Defendants' Exh. 4, at 42-43, 83-84.)  In the ensuing debate, various Board members bemoaned the "ongoing problem" with the Section 8 program, the lack of leadership on Smith's part, the failure of Smith to accomplish basic tasks in running the program, the program's lack of compliance with Section 8 requirements, the lack of training of Smith's subordinates, the Board's previous attempts to impress upon Smith the need to improve her performance, the failure of Smith to improve, and the risk that the Housing Authority could lose its Section 8 program as a result of Smith's poor performance.  (*Id.* at 51-52, 62-64, 71-73.)  The record further shows that on December 8, 2004, following a hearing, at a regular Board meeting Flott was one of four Board members (the fifth abstained) who voted to terminate Smith's employment with pay.  (Defendants' Exh. 7, at 53-54.)[19]

These kinds of functions (*e.g.*, making motions at Board meetings concerning matters of importance to Housing Authority operations, participating in debate on such motions, and voting on such motions) lie in the heartland of the authority of a Board member.  Plaintiff has never suggested otherwise, much less proffered evidence that might support a conclusion that Flott's

---

an "officer" or "employee" of the employing entity; to the contrary, given the obvious parallels between those functions, there is every reason to think that the *Pegram* reasoning should apply with equal force to a Board member as to an officer or employee.

[19]    Defendants assert that Flott's deposition testimony reveals that his actions were prompted by his assessment that Smith was not performing effectively as Section 8 manager. (Defendants' Reply Brief (doc. 34), at 10-11.)  Unfortunately, defendants have not included the requisite excerpts of Flott's deposition in the record, so the Court cannot consider defendants' characterization of his testimony.  That said, these concerns are echoed in the minutes of the Board meetings, which are included in the record and which therefore can be considered in weighing the pending Rule 56 Motion.

actions exceeded the scope of his authority on the Board.[20]  There being no evidence from which a reasonable factfinder could conclude that Flott was acting outside his usual and customary duties as a Board member when he proposed, debated and voted on Smith's discharge, plaintiff's tortious interference claim against him cannot stand, as a matter of law.  *See generally Hickman v. Winston County Hosp. Bd.*, 508 So.2d 237, 239-40 (Ala. 1987) (citing with approval authorities from other jurisdictions for proposition that officer/employee cannot be liable so long as he acts "within the general range of his authority," and that liability hinges on showing that individual "was acting other than in accord with his usual and customary duties" and "contrary to the best interest of the corporation").[21]

Because it is a prerequisite for Count III that plaintiff establish that Flott was acting outside the scope of his authority for the Board in his allegedly interfering conduct, and because plaintiff has come forward with neither evidence nor argument to support such a determination, defendants are entitled to summary judgment on Count III.

**IV.    Conclusion.**

For all of the foregoing reasons, defendants' Motion for Summary Judgment (doc. 29) is **granted**.  Plaintiff's claims are **dismissed with prejudice**.  A separate judgment will enter.

DONE and ORDERED this 6th day of March, 2007.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[20]    At most, plaintiff offers a single conclusory allegation that "Flott engineered Bessie Smith's termination not for the benefit of PHA, but in order to put his own person - Felicia Moore - in the job."  (Plaintiff's Brief (doc. 31), at 20.)  This inference is not supported by the evidence, however, as the justifications for discharge proffered by Flott and his colleagues during Board meetings related to their concerns that the Section 8 program was being so poorly run by Smith that its continued viability was in jeopardy.  Such concerns - which plaintiff has not rebutted - had everything to do with the Housing Authority's best interests, and nothing to do with any personal agenda that Flott might have sought to advance.

[21]    In light of this determination, the undersigned need not reach defendants' alternative arguments as to Count III, including their contentions that plaintiff failed to show actual malice and that any interference by Flott was justified.